Janice M. Bellucci, SBN 108911
(JMBellucci@aol.com)
LAW OFFICE OF JANICE M. BELLUCCI
1215 K Street, 17th Floor
Sacramento, CA 95814
Tel:    (805) 896-7854
Fax:   (916) 823-5248

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE #1, an individual, and JOHN DOE #2, an individual, | Case No. **'17 CV 1581 W    WVG** |
| Plaintiffs, | |
| vs. | **COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983, FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| CITY OF SAN DEIGO, an incorporated California Municipality; and DOES 1 to 10, inclusive, | |
| Defendants. | |

## INTRODUCTION

1.      Against the advice of its own City Attorney, the San Diego City Council has defied multiple rulings of the California Supreme Court and the Court of Appeals by refusing to repeal an Ordinance that is unconstitutional on its face.  The Ordinance, which categorically bans registered sex offenders ("Registrants") from residing in virtually the entire City of San Diego, was defended by Councilmembers who "don't like them living

in our communities," and "don't even want to see them come back."[1]  One Councilmember confessed that "I don't have a lot of sympathy in my heart for sex offenders," and justified the City's banishment of Registrants as a class by reference to unnamed "studies" demonstrating that Registrants cannot be "rehabilitated."[2]  Yet, voluminous data from subject matter experts such as the California Sex Offender Management Board (CASOMB) demonstrates just the opposite, and has compelled CASOMB to strongly oppose local residency restrictions like those in San Diego.  See Generally Exhibit A, CASOMB, HOMELESSNESS AMONG CALIFORNIA'S REGISTERED OFFENDERS – AN UPDATE (Aug. 2011).[3]

2.     In the estimation of one San Diego City Councilmember, the City's refusal to repeal its residency restrictions Ordinance equates to "go[ing] with our heart and our emotion" and contravening "our form of democracy and constitutional justice."[4]  The same Councilmember predicted that the City's defiance of several court rulings was futile because "we will wind up . . . being told by a court to repeal our ordinance anyway."[5]

3.     This civil rights action challenges the entirety of Chapter 5, Article 8, Division 6 of the San Diego Municipal Code that constitute residency restrictions for Registrants (hereinafter, the "San Diego Residency Restrictions" or "the Ordinance") because, on their face and as applied, the San Diego Residency Restrictions are

---

[1] The quotations herein were made during the meeting of the San Diego City Council on April 1, 2017.  A transcript of the meeting is available here: http://granicus.sandiego.gov/TranscriptViewer.php?view_id=3&clip_id=7111. A video recording of the relevant proceedings is available at timestamp 34:00-43:16 here: http://granicus.sandiego.gov/ViewPublisher.php?view_id=3.

[2] Id.

[3] Exhibit A, hereinafter "CASOMB REPORT," http://www.casomb.org/docs/Residence_Paper_Final.pdf.

[4] See Note 1, supra.

[5] Id.

preempted by California state law, and violate the Fourteenth Amendment to the United States Constitution, and are unconstitutionally vague and overbroad, as more specifically alleged herein.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1343(a), 1367(a), and 2201, as well as 42 U.S.C. Section 1983.

5.      Under 28 U.S.C. Section 1391(b), venue is proper in this Federal district because Defendant City of San Diego is a municipality in this district and the events giving rise to the claims have occurred and continue to occur in this district.

## PARTIES

6.      Plaintiff John Doe #1 is and at all times material to this action was a resident of the State of California as well as a citizen of the United States. Plaintiff John Doe #1 is required to register as a sex offender pursuant to California Penal Code Section 290, *et seq*. for an offense committed after April 13, 2008. Plaintiff John Doe #1 resides in the City of San Diego and is subject to the Ordinance. Plaintiff John Doe #1 also intends to establish, and would in fact establish, a new lawful permanent residence in the City of San Diego. Plaintiff John Doe #1 also intends to establish, and would in fact establish, temporary residences in the City of San Diego, including by spending nights in a hotel, motel, or inn within the City, and at the homes of friends and relatives. Plaintiff John Doe #1 is precluded from establishing these residences in the City of San Diego by the Ordinance and its penalties, which include incarceration and/or fines.

7.      Plaintiff John Doe #2 is and at all times material to this action was a resident of the State of California as well as a citizen of the United States. Plaintiff Doe #2 is required to register as a sex offender pursuant to California Penal Code Section 290, *et seq*. for an offense committed after April 13, 2008. Plaintiff Doe #2 resides in the County of San Diego and intends to establish, and would in fact establish, a new lawful permanent residence in the City of San Diego. Plaintiff Doe #2 also intends to establish,

and would in fact establish, temporary residences in the City of San Diego, including by spending nights in a hotel, motel, or inn within the City, and at the homes of friends and relatives. Plaintiff Doe #2 is precluded from establishing these residences in the City of San Diego by the Ordinance and its penalties, which include incarceration and/or fines.

8. Plaintiffs John Doe #1 and John Doe #2 shall be referred to herein collectively as "Plaintiffs."

9. The City of San Diego ("San Diego" or "Defendant") is an incorporated municipality located in San Diego County, California. San Diego adopted the Ordinance at issue here through the nine-member San Diego City Council and enforces that ordinance through the San Diego Police Department.

10. The true names and capacities of Defendants sued as Does 1 through 10 are unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Plaintiffs will seek leave to amend this Complaint, if necessary, to reflect the true names once they have been ascertained.

11. San Diego and Does 1 through 10 are collectively referred to herein as "Defendants."

## FACTS

12. The San Diego City Council adopted Ordinance O-19724, which was subsequently codified as San Diego Municipal Code, Chapter 5, Article 8, Division 6, Sections 58.0601 through 58.0607, entitled the "Child Protection Act" (hereinafter, the "San Diego Residency Restrictions" or "the Ordinance") on March 14, 2008. The Ordinance went into effect on April 13, 2008.

13. The Ordinance declares as follows:

**§ 58.0603     Restricted Areas for Sex Offenders-Residency**

It is unlawful for any registered sex offender to reside within 2000 feet of any of the following places:

(a)     Amusement center
(b)     Arcade

      (c)     Child day care facility

      (d)     Library

      (e)     Playground

      (f)     Park

      (g)     School

**§ 58.0604    Measure of Distance**

The 2000-foot buffer zone is measured in a straight line, in all directions, without regard to intervening structures, from the property line of the places listed in section 58.0603 (a) through (g).

Ordinance § 58.0603.[6] The "2000-foot buffer zones" created by the Ordinance shall be referred to herein as "exclusion zones."

14.    The Ordinance defines "registered sex offender" as "any person required to register pursuant to California Penal Code section 290." Ordinance § 58.0602. The definition of "registered sex offender" includes all Registrants, even those whose convictions did not involve a minor, as well as those who are not currently serving a term of parole.

15.    The Ordinance defines "**Amusement center**" as "any establishment open to the public who provides entertainment directed at minors, or whose play equipment is primarily used by minors. It includes places like Chuck E. Cheese, Sea World, the San Diego Zoo and children's museums. It includes but is not limited to establishments that provide activities like gymnastics, laser tag, art classes, so long as the primary users of the establishment are minors. It does not include restaurants, movie theaters or shopping malls. It does not include businesses whose primary business is to sell toys or games or other similar products primarily used by minors." Ordinance § 58.0602. While the vagueness of this definition prevents an accurate and complete count, there are, upon information and belief, over one hundred fifty (150) amusement centers within San Diego.

---

[6] The full text of the Ordinance is attached hereto as Exhibit B.

16.    The Ordinance defines "**Arcade**" as "any establishment (other than a pool hall or billiard hall defined in Section 33.1610) open to the public with six or more games of skill or amusement defined in Section 33.1641 installed on the premises.  An arcade includes any lawful business establishment not otherwise police regulated that installs six or more games of skill or amusement."  Ordinance § 58.0602 (citing San Diego Municipal Code § 33.1635).  While the vagueness of this definition prevents an accurate and complete count, there are, upon information and belief, over twenty four (24) Amusement centers within San Diego.

17.    The Ordinance defines "**Child day care facility**" as "any facility licensed as such pursuant to California Health and Safety Code section 1596.750, except it does not include a small family day care home as defined in California Health and Safety Code section 1596.78(c)."  Ordinance § 58.0602.  While the vagueness of this definition prevents an accurate and complete count, there are, upon information and belief, over one hundred (100) Amusement centers within San Diego.

18.    The Ordinance defines "**Library**" as "any public library operated by the City of San Diego."  Ordinance § 58.0602.  Upon information and belief, and based on publicly available records, there are at least thirty-eight (38) libraries within San Diego.

19.    The Ordinance defines "**Playground**" as "any outdoor premises or grounds owned or operated by the City of San Diego that contains any play or athletic equipment used or intended to be used by minors."  Ordinance § 58.0602.  While the vagueness of this definition prevents an accurate and complete count, there are, upon information and belief, over one hundred (100) playgrounds within San Diego.

20.    The Ordinance states that the term "'**Park**' has the same meaning as in California Penal Code section 3003.5(b)."  Ordinance § 58.0602.  However, California Penal Code section 3003.5(b) does not define the term "Park," but instead provides that a Registrant who is currently serving a term of parole may not reside within 2,000 feet of a "park where children regularly gather."  This provision was declared unconstitutional by

the California Supreme Court when enforced as a blanket restriction in San Diego County. *In re Taylor*, 60 Cal. 4th 1019, 1042 (2015). While the vagueness of the Ordinance's definition of "Park" prevents an accurate and complete count, there are, upon information and belief, more than four hundred (400) parks within San Diego.

21. The Ordinance defines "**School**" as "any public or state licensed private elementary or secondary school, attendance at which satisfies the compulsory education laws of the State of California. It does not include a residence where parents or guardians provide home schooling. This definition shall be interpreted to be consistent with California Penal Code section 3003.5(b)." Ordinance § 58.0602. Upon information and belief, and based on publicly available records, there are more than (300) public and private schools within San Diego.

22. The San Diego Municipal Code declares that "[a] violation of any of the provisions or failing to comply with any of the mandatory requirements of this Code shall constitute a misdemeanor," which "shall be punishable by a fine of not more than one thousand dollars ($1000) or by imprisonment in the County Jail for a period of not more than six months or by both fine and imprisonment." San Diego Municipal Code § 12.0201. The Code also provides that "[e]ach such person shall be charged with a separate offense for each and every day during any portion of which any violation of any provision of this Code is committed, continued or permitted by such person and shall, upon conviction, be punished accordingly." San Diego Municipal Code § 12.0201. (emphasis added).

**San Diego's Residential Exclusion Zones Cover Virtually the Entire City as Confirmed by Evidence Adopted by the California Supreme Court**

23. On information and belief, the San Diego Residency Restrictions are far more restrictive than other residency restrictions previously struck down by the California Supreme Court.

a.      In the case *In re Taylor*, the California Supreme Court examined the impact of the similar but less restrictive residency restrictions scheme contained in California Penal Code section 3003.5, also known as "Jessica's Law" (hereinafter "Section 3003.5").  Section 3003.5 imposes 2,000-foot residential exclusion zones around only two facilities:  parks and K-12 schools.  The *Taylor* Court adopted evidence in the form of a comprehensive GIS analysis that plotted the location of each school and park within the whole of San Diego County – including the City of San Diego – and drew a 2,000-foot exclusion zone around each facility.  The Supreme Court also adopted evidentiary findings which concluded that a 2,000-foot exclusion zone around each school and park "show[s] huge swaths of urban and suburban San Diego, including virtually all of the downtown area, completely consumed by the [residency] restrictions."  60 Cal. 4th at 1029.

b.      By comparison, in this matter, the City of San Diego's Ordinance excludes Plaintiffs and other Registrants from even larger "swaths" of the City because the Ordinance imposes 2,000-foot exclusion zones around not only the City's 700+ parks and schools, but also around each amusement center, arcade, child day care facility, library, and playground in the City.  The total number of such additional facilities is conservatively estimated at 400.  On information and belief, when all relevant properties are considered, the aggregate size of the exclusion zones imposed by the Ordinance exceeds the total land area of the City of San Diego by more than 50%.

24.     The practical impact of the City of San Diego's Ordinance is amplified by the fact that the population density of the City of San Diego is more than 500 percent higher than the population density of San Diego County.[7]  In the *Taylor* case, the Court

---

[7] *Compare* United States Census Bureau, State & County QuickFacts – "San Diego County, California" (population density 735.8 per sq/mi), *with* United States Census

concluded that the residency restrictions in that case excluded Registrants from approximately 97% of multifamily rental property in San Diego County.  60 Cal. 4th at 1039-40.  On information and belief, the San Diego Residency Restrictions exclude Registrants from an *even greater* percentage of multifamily rental housing in the City of San Diego due to the increased population density of the City relative to the County, as well as the hundreds of additional exclusion zones around amusement centers, arcades, child day care centers, libraries, and playgrounds not considered in the *Taylor* analysis.  In effect, the San Diego Residency Restrictions are tantamount to banishment of Registrants from all residences in the City.

25.      Upon information and belief, even if the San Diego Residency Restrictions did permit housing for Plaintiffs and other Registrants in multifamily developments, such housing would be neither available nor affordable.  Critically, the California Supreme Court held that, when assessing the impact of residency restrictions, the appropriate measure is not all available housing, but the availability of affordable housing of the type that Registrants are likely to occupy:  <u>multifamily rental units for $850 per month or less</u>.  60 Cal. 4th 1019, 1029 (2015).  Specifically, the Supreme Court treated single-family residences as irrelevant to its analysis because Registrants are "unlikely candidates to rent single-family homes."  60 Cal 4th at 1029.  The Supreme Court also ignored housing that could not be obtained for less than $850 per month, which is representative of the SDI and SSDI benefits available to registrants.  60 Cal 4th at 1030.  Upon information and belief, the median gross monthly rent in the City of San Diego exceeds $1,440, which is more than 70 percent above the rate of rent deemed affordable by the *Taylor* Court.[8] Further, the housing restrictions in San Diego are exacerbated by the fact that multifamily housing in San Diego is limited by the relatively high percentage of single family housing

Bureau, State & County QuickFacts – "San Diego, City, California" (population density 4020.4 per sq/mi), http://quickfacts.census.gov.

[8] http://www.city-data.com/city/San-Diego-California.html.

in that City, as well as the large portions of the City dedicated to non-residential uses, such as the City's numerous colleges and universities, commercial and industrial properties, aviation uses, and open space uses. Therefore, in order to comply with the San Diego Residency Restrictions, Plaintiffs and all Registrants are unable to "reside" within San Diego because there is no affordable residential real estate available to them

26. The San Diego Residency Restrictions state that they "appl[y] to any person who is required to register as a sex offender based on a crime committed on or after April 13, 2008." Ordinance § 58.0606. By definition, the San Diego Residency Restrictions do not apply to anyone who is not required to register as a sex offender pursuant to Penal Code section 290. The San Diego Residency Restrictions also "[do] not apply to any registered sex offender who is currently on probation or parole for an offense for which registration is required, and whose conditions of probation or parole would otherwise violate that subsection." Ordinance § 58.0605(a). The San Diego Residency Restrictions also exempt any Registrant who "resides outside 2000 feet of any of the places listed in section 58.0603 on April 13, 2008 . . . if one of the entities listed in section 58.0603 moves within 2000 feet of the [Registrant's] residence after April 13, 2008." Ordinance § 58.0605(b).

**The San Diego Residency Restrictions are Unconstitutional as Ruled by the California Supreme Court in _Taylor_**

27. In March 2015, the California Supreme Court issued its controlling ruling in the case _In re Taylor_. _Taylor_ considered the application of Penal Code Section 3003.5 to Registrants on parole in San Diego County. As discussed above, Section 3003.5 prohibits Registrants on parole from residing within 2,000 feet of schools and parks. The Petitioners in _Taylor_ were four Registrants then on parole in San Diego County. The _Taylor_ Court ruled, _inter alia_, that:

    a.    Registrants in California "retain certain basic rights and liberty interests, and enjoy a measure of constitutional protection against arbitrary,

oppressive and unreasonable curtailment of 'the core values of unqualified liberty,'" **even when on parole**, such that "**[b]lanket enforcement of Jessica's Law's mandatory restrictions against registered sex offenders on parole in San Diego County impedes those basic, albeit limited, constitutional rights**." 60 Cal. 4th at 1038, 1042 (emphasis added).

b.      **Blanket enforcement of Section 3003.5 "cannot survive rational basis scrutiny** because it has hampered efforts to monitor, supervise, and rehabilitate such parolees in the interests of public safety, and as such, bears **no rational relationship to advancing the state's legitimate goal of protecting children** . . . ." Id. at 1042 (emphasis added).

c.      The residency restrictions "severely restricted [Registrants'] ability to find housing in compliance with the statute" since "huge swaths of urban and suburban San Diego, including virtually all of the downtown area, [were] completely consumed by the restrictions." 60 Cal 4th at 1023, 1029. Specifically, the restrictions "effectively barred petitioners' access to approximately 97 percent of multifamily rental housing units in San Diego County." 60 Cal 4th at 1029. Furthermore, "the small percentage [i.e., 2.9%] of remaining complaint housing was not necessarily available to paroled sex offenders due to a variety of factors, including low vacancy rates, high prices, and the unwillingness of some landlords to rent to them." 60 Cal. 4th at 1039-40 (emphasis added). Thus, although the vacancy rate for low-income rental housing was ostensibly 5-8%, these additional limitations significantly reduced the number of units actually available to registrants. 60 Cal 4th at 1029-30.

d.      The residency restrictions impermissibly "impact the ability of some petitioners to live and associate with family members" because "if the family members' residence is not in a compliant location, they [i.e., Registrants] cannot live there." 60 Cal 4th at 1040.

e. The residency restrictions are "disruptive in a way that hinders" Registrants' access to reasonably opportunities for employment, medical treatment, psychological counseling, drug and alcohol dependency services, other rehabilitative and social services, which contradicts the intent of Section 3003.5. 60 Cal 4th at 1040 & n.10.

f. Because of the constitutional deprivations that result from blanket enforcement of residency restrictions, the state may impose residency restrictions **only when "they are based on, and supported by, the particularized circumstances of each individual parolee."** 60 Cal 4th at 1042 (emphasis added).

28. As discussed above, the City of San Diego's Residency Restrictions are far more onerous than those struck down in *Taylor* for several reasons, including but not limited to: (a) the increased population density of the City of San Diego relative to San Diego County; (b) the large number of additional properties around which a residential exclusion zone is imposed; and (c) the application of the San Diego Residency Restrictions to Registrants who are not currently serving terms of parole. Such Registrants enjoy the same constitutional rights as non-Registrants, and therefore greater constitutional rights than the petitioners in *Taylor*.

**Application of the San Diego County Residency Restrictions to Non-Parolees is Preempted by California Law**

29. In enacting the Ordinance, the City of San Diego relied on Section 3003.5(c), which states that "[n]othing in this section shall prohibit municipal jurisdictions from enacting local ordinances that further restrict the residency of any person for whom registration is required pursuant to Section 290."

30. However, Section 3003.5(c) does not authorize local governments to regulate the residences of non-parolees because, as interpreted by the courts, the phrase "any person" as used in that statute refers only to individuals on parole. *In re E.J.*, 47

Cal. 4th 1258, 1271 (2010) ("Section 3003.5 of the Penal Code is found in part 3, title 1, chapter 8 (entitled 'Length of Term of Imprisonment and Parolees') and, as the section's language reflects, its provisions are obviously intended to apply to 'person[s] . . . released on parole.'" (emphasis in original)). *See also People v. Lynch*, 2 Cal. App. 5th 524, 527-528 (2016) (Section 3003.5(c) does not authorized residency restrictions for individuals on probation).

31. The *Lynch* opinion explains the rationale for limiting the law's application to parolees only:

> ***[A]pplying the residency restriction to nonparolees would conflict with the purpose of registration***. We believe Section 290 registration laws aim at permitting local enforcement authorities to monitor these registrants in the community. Less restriction on housing sites for probationers permits this supervision function. Also, ***restricting access to housing opportunity disrupts the rehabilitation process for the broader group of men and women on probation; they should focus on treatment and rehabilitation instead of a limited residential market***.

2 Cal. App. 5th at 528 (emphasis added). See also *Doe v. City of Lynn*, 472 Mass. 521, 531 & n.15 (2015) (As a supervised and stable home has been recognized as a factor that minimizes the sex offender's risk of reoffense, th[e] disruption [imposed by residency restrictions] is inconsistent with the Legislature's goal of protecting the public." (citing *Taylor*, 60 Cal. 4th 1019)).

32. Because the San Diego Residency Restrictions regulate the residences of non-parolees, the San Diego Residency Restrictions are unconstitutional on preemption grounds. *People v. Nguyen*, 222 Cal. App. 4th 1168, 1181 (2014), *rev. denied* 2014 LEXIS 3030 (The California Legislature has "established a complete system for regulating a sex offender's daily life and manifested a legislative intention to fully occupy the field ***to the exclusion of . . . local regulations***." (emphasis added; citing Cal. Const. Art. XI § 7)).

///

**In Refusing to Repeal their Residency Restrictions, the San Diego City Council Rejected the Governing Law, Empirical Research, and the Recommendation of its own City Attorney**

33.     In December 2016, Plaintiffs' counsel sent a letter to the Mayor of San Diego inquiring whether the Ordinance has been, or was to be, repealed in light of *In re Taylor*, *People v. Nguyen*, *People v. Lynch*, and other decisions.  Counsel received no response from either the Mayor or the City Attorney's Office.

34.     Sometime before August 1, 2017, the San Diego City Attorney recommended repeal of the Ordinance to the City Council, and prepared Ordinance no. O-2018-9 (hereinafter, the "Repeal Ordinance").  The Repeal Ordinance was to be considered by the San Diego City Council and, if passed, would have repealed the San Diego Residency Restrictions in their entirety.  The Repeal Ordinance contained the following recitals, which acknowledged the *Taylor* decision and the unenforceability of the San Diego Residency Restrictions:

> WHEREAS, The [Ordinance] prohibits registered sex offenders from residing within 2,000 feet of an amusement center, arcade, child day care facility, library, playground, park, or school; and

> WHEREAS, in March 2015, the California Supreme Court struck down the Jessica's Law sex offender residency restriction, applied uniformly as a parole condition, in a case originating from San Diego County (In re Taylor (Taylor), 60 Cal. 4th 1019 (2015)); and

> WHEREAS, the Court's decision was based on evidence from San Diego County showing that the registered sex offenders in question were barred from 97 percent of available rental housing due to the residency restriction, thereby increasing homelessness, and that the restriction hindered access to treatment, job opportunities, and other social services; and

> WHEREAS, based on these evidentiary findings, the Court found the Jessica's Law sex offender residency restrictions, applied uniformly, to be unreasonable, arbitrary and oppressive, and thus, unconstitutional; and

**WHEREAS, the [Ordinance] <u>restricts residency from many more places than Jessica's Law and is likely not enforceable in light of the Taylor case[.]</u>**[9]

35.     Despite the City Attorney's recommendation and the above-referenced recitals in the Repeal Ordinance, the San Diego City Council first voted 4-4 against the Repeal Ordinance at the August 1, 2017 City Council meeting.  Later during that meeting, the City Attorney "urge[d] the Council to reconsider the decision," explaining that the City Attorney's office "urg[es] you to repeal" because of the "substantial concerns about the legality of the [Residency Restrictions] Ordinance."[10]  When pressed by members of the Council to explain the basis for the recommendation to repeal, the City Attorney explained that the Ordinance is "potentially not constitutional" and that "we [] give the public false hope when we have an ordinance on the books like this."[11] The City Attorney stressed that the San Diego Police Department "ha[s] laws on the books that are sufficient to protect the public," and that repeal of the Ordinance is necessary so that the City Attorney's Office and the City itself can "us[e] City resources to protect residents in a way that means something."[12]

36.     The San Diego City Council nevertheless again rejected the City Attorney's recommendation and voted 5-4 against the Repeal Ordinance.

///

///

///

///

---

[9] http://dockets.sandiego.gov/sirepub/cache/2/lo5tovjldt4tsmtldj4kdpbs/ 114463708022017044921641. PDF.

[10] See note 1, *supra*.

[11] *Id.*

[12] *Id.*

**In Refusing to Repeal their Residency Restrictions, the San Diego City Council Followed "Hearts and Emotions" Rather than the Law and the Facts**

37.     In justifying their rejection of federal law, California law, and the recommendation of the City Attorney, members of the San Diego City Council repeated demonstrably inaccurate myths about Registrants in general, and the efficacy of residency restrictions in particular.

a.     For example, Councilmembers spoke of "sex offenders" as a monolithic and homogenous group, ignoring the vast differences among the individuals who bear that label.  Specifically, the label "sex offender" applies to a multitude of offenses that range from non-violent, non-contact offenses such as indecent exposure, "sexting," consensual teen-aged sex, urinating in a public park, and other misdemeanors, to violent contact offenses.  See Cal. Penal Code § 290(c); *Nunez v. Holder*, 594 F.3d 1124, 1133-38 (2010) (discussing broad range of relatively innocuous conduct to which California's misdemeanor indecent exposure statute has been applied, including "nude dancing at a bar" and the "harmless" acts of "pranksters with poor judgment").  See also *United States v. Wolf Child*, 699 F.3d 1082, 1093-94 (9th Cir. 2012) (Because "[n]ot all sex offenders are the same; nor are all who plead guilty to a particular type of offense," the label "sex offender" does not amount to evidence of future risk.).  Furthermore, many Registrants committed their offenses decades ago without any subsequent re-offense; yet, the San Diego Residency Restrictions treat those Registrants the same as those who recently committed a violent offense.

b.     Councilmembers' opinions about the public safety risk posed by Registrants also contradict the vast empirical data on this subject.  One Councilmember who stated that "I don't have a lot of sympathy in my heart for sex offenders, and "don't like them living in our communities," opined that "I know some people can be rehabilitated, but time and again studies show that sex

offenders are usually not in that category.  I feel very strongly about that."[13]  Yet, a vast amount of empirical evidence reflected in academic studies over many decades shows just the opposite, and contradicts the myth of uniform, high, and enduring re-offense rates for Registrants.  For example, the U.S. Department of Justice reports that the lifetime re-offense rate for all sex offenders nationwide is only 5.3 percent.[14]  And for sex offenders on parole, the California Department of Corrections and Rehabilitation (the agency responsible for enforcing Section 3003.5) reports that the re-offense rate is less than one percent.[15]  Further, longitudinal research adopted by CASOMB confirms that the risk of re-offense diminishes with each passing year, and that the risk of re-offense for high-risk individuals disappears after 17 years.[16]  As a class, CASOMB explains that Registrants have the lowest re-offense rate for any crime except murder.[17]

---

[13] See note 1, *supra*.

[14] U.S. DEPT. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF SEX OFFENDERS RELEASED FROM PRISON IN 1994, at 7 (Nov. 2003), http://www.bjs.gov/content/pub/pdf/rsorp94.pdf.

[15] CALIF. DEPT. OF CORRECTIONS AND REHABILITATION, 2014 OUTCOME EVALUATION REPORT 30 (July 2015), http://www.cdcr.ca.gov/Adult_Research_Branch/ Research_Documents/2014_Outcome_ Evaluation_Report_7-6-2015.pdf.

[16] CASOMB, *A Better Path to Community Safety: Sex Offender Registration in California – "Tiering Background Paper"*, at 15-16 (2013), http://www.casomb.org/docs/Tiering%20Background%20Paper %20FINAL%20FINAL%204-2-14.pdf.

[17] Exhibit A, CASOMB REPORT, *supra* note 3, at 4.  The extreme variation of risk of harm within California's sex offender registry is discussed in an informative video recently released by CASOMB which features various government officials and subject matter experts.  https://www.youtube.com/watch?v=GBoy2FB27yg.  See also Jill S. Levenson, Ph.D., *Hidden Challenges: Sex Offenders Legislated into Homelessness*, Journal of Social Work, at 8 (June 22, 2016) (collecting scholarship that confirms the generally low risk of re-offense presented by a Registrant, and concluding that "Residential restriction laws should be abolished in their current form" because "they contradict decades of research

38.     Finally, Councilmembers also ignored voluminous data from CASOMB and other governmental and academic sources demonstrating that residency restrictions do not contribute to public safety in a meaningful way because they are designed to prevent a type of crime that rarely, if ever, occurs:  stranger abductions from public places.  In a 2014 document prepared for local governments and entitled "Just the Facts," CASOMB concludes that "[r]esidency restrictions promote a false sense of security for the community," and cites with approval another state's 16-year survey which found that "not one sex offender . . . has been re-incarcerated for a sex offense in which he made contact with a juvenile near a school, park, or day care center close to his home."[18] CASMOB also emphasized that "[r]esidency restrictions would not have protected Jessica," the victim for whom Jessica's Law (Section 3003.5) is named.  For these and other reasons, CASOMB has produced a voluminous, 30-page report on residency restrictions in California, which is attached hereto as Exhibit A and concludes as follows:

> **CONCLUSIONS.  Based on all that is known about sex offender recidivism and the nature of most sex offenses involving children, there is no evidence that residency restrictions are related to preventing or deterring sex crimes against children.**  *To the contrary, the evidence strongly suggests that residency restrictions are likely to have the unintended effect of increasing the likelihood of sexual re-offense.*[19]

///

///

///

demonstrating that when criminal offenders return to communities they are much more likely to reintegrate successfully when they have meaningful employment, stable housing, and the support of law-abiding family and peers."), http://jsw.sagepub.com/content/early/2016 /06/21/1468017316654811.abstract

[18] http://www.casomb.org/docs/Just%20the%20facts%202-26-14.pdf (emphasis added).

[19] Exhibit A, *supra* note 3, at 26 (emphasis added).

**The San Diego Residency Restrictions Are Unconstitutional For Numerous Reasons**

39. Because the San Diego Residency Restrictions prohibit Plaintiffs and other Registrants from residing in San Diego, the San Diego Residency Restrictions accomplish the unconstitutional goal of banishment, do not serve any legitimate government purpose, and are not appropriately tailored or related to any lawful purpose.

40. Because the San Diego Residency Restrictions prohibit Plaintiff Jake Doe and other Registrants who currently reside outside of San Diego from acquiring a residence in San Diego for even one night, the San Diego Residency Restrictions accomplish the unconstitutional goal of banishment, do not serve any legitimate government purpose, and are not appropriately tailored or related to any lawful purpose.

41. Because the San Diego Residency Restrictions prohibit Plaintiff John Doe and other Registrants who already reside within San Diego from moving to a new residence within that city, the San Diego Residency Restrictions accomplish the unconstitutional goal of banishment, do not serve any legitimate government purpose, and are not appropriately tailored or related to any lawful purpose.

42. Section 3003.5(c), authorizes local governments to enact ordinances that restrict the residency of Registrants who are subject to the residency restrictions of Penal Code section 3003.5(a). However, Section 3003.5(a) does not authorize local governments to impose residency restrictions on non-parolees. *People v. Lynch*, 2 Cal. App. 5th 524 (2016). The San Diego Residency Restrictions are therefore preempted by California state law and are therefore unconstitutional because California state law occupies the field of regulations that govern Registrants' daily lives, including the locations in which they may be present. *People v. Nguyen*, 222 Cal. App. 4th 1168, 1180-81 (2014).

43. Moreover, to the extent that local governments may impose residency restrictions on parolees, the California Supreme Court has ruled that such restrictions may not be imposed upon Registrants in a manner that deprives them of their

constitutional rights and liberty interests, including their right to be free from arbitrary, oppressive, and unreasonable laws that bear no rational relationship to the state's goal of protecting residents. *In re Taylor*, 60 Cal. 4th 1019, 1042 (2015).

44.     The San Diego Residency Restrictions subject Plaintiffs and other Registrants to arbitrary, oppressive, and unreasonable governmental action in that they are blanket proscriptions applied to all affected Registrants without regard to the particularized circumstance of each individual or any rational relation to public safety. See *Taylor*, 60 Cal. 4th at 1042. The irrationality of the San Diego Residency Restrictions is evidenced by the arbitrariness of their application to many foreseeable and everyday situations, including but not limited to:

a.      Imposing a residency restriction of 2,000 feet which, according to CASOMB, "is too great a distance to be able to see anything or anyone in a meaningful way." Indeed, in opposing residency restrictions outright, CASOMB concludes that "There is no rational basis that supports 2,000 feet as a distance that increases the safety of children."[20]

b.      Prohibiting residency in relationships to schools, parks, and libraries, and thereby limiting Registrants' proximity to those locations primarily during times such as evenings and weekends when children are unlikely to be present at those locations.

c.      The Ordinance's application to Registrants whose offense involved an adult, but who are nevertheless barred from residing in proximity to schools when their offense involved neither schools nor children, the class of individuals that the Ordinance purportedly seeks to protect.

45.     The San Diego Residency Restrictions bear no rational relationship to any legitimate governmental purpose in that they contradict and hamper the objectives of

---

[20] Exhibit A, *supra* note 3, at 25.

Section 3003.5; fail to protect the public; and deprive Plaintiffs and all Registrants of stable homes, family support, social and medical services, and other means necessary to live productive, law-abiding lives, as confirmed by numerous authorities, mentioned herein.

46. The San Diego Residency Restrictions lack any rational relationship to a legitimate governmental interest by distinguishing between Registrants convicted of offenses before and after the effective date of the Ordinance, and by imposing the San Diego Residency Restrictions on the latter group but not the former. Imposing such substantial burdens on the rights of certain Registrants based solely on the effective date of the Ordinance is arbitrary and therefore unconstitutional.

47. The San Diego Residency Restrictions are unconstitutionally vague in that they fail to permit persons of ordinary intelligence from knowing what the Ordinance requires, and likewise encourage arbitrary and discriminatory enforcement of the Ordinance. For example, the definition of "Amusement center" in the Ordinance encompasses "any establishment open to the public who provides entertainment directed at minors, or whose play equipment is primarily used by minors . . . ., includ[ing] but [] not limited to establishments that provide activities like gymnastics, laser tag, art classes, so long as the primary users of the establishment are minors." A person of ordinary intelligence cannot reasonably be expected to know whether the entertainment at a given establishment is "directed at minors," since this concerns the mental states of third parties and other subjective measures. A person of ordinary intelligence also cannot be reasonably expected to know whether the "play equipment" at a given establishment is "primarily" used by minors, or is used by minors to a lesser degree. A person of ordinary intelligence also cannot reasonably be expected to know whether the "primary users" of a given establishment are minors, particularly if the establishments conduct events that cannot be observed unless one joins a class or pays a fee. Finally, the vague definitions of "Amusement center," "Arcade," "Playground," "Child day care facility," "Library,"

"Playground," "Park," and "School" prevent Registrants from knowing the precise identity and size of the facilities that meet these definitions, as well as other critical information necessary to comply with the Ordinance and to prevent arbitrary enforcement, such as whether the measure of distance includes parking lots, storage spaces, and other structures that do not typically shelter or contain people.

48.     Defendants have expended, are expending, and/or will expend public funds to enforce, prepare to enforce, and/or attempt to enforce the San Diego Residency Restrictions.  Defendants have a mandatory duty to refrain from expending public funds to enforce, prepare to enforce, and/or attempt to enforce the San Diego Residency Restrictions because they are preempted by state law and unconstitutional.

49.     In addition, while the San Diego Residency Restrictions do not by their terms impose burdens on persons other than Registrants, the San Diego Residency Restrictions, as applied, could impose burdens upon family members of Registrants and upon others who reside with or wish to reside with Registrants, with the exceptions as previously defined.

50.     Defendants lack either a compelling or substantial legitimate governmental interest in restraining the civil liberties of Registrants in the manner expressly provided by the San Diego Residency Restrictions.

51.     In addition, the San Diego Residency Restrictions are not the least restrictive means to further any compelling or substantial governmental interest including, but not limited to, protecting children as the San Diego Residency Restrictions purport.

52.     Further, the San Diego Residency Restrictions fail to pass constitutional muster because their restrictions are not sufficiently narrowly tailored to serve a legitimate government interest.

53.     The San Diego Residency Restrictions are overly broad and burden substantially more constitutionally protected conduct than is necessary to further any legitimate governmental interest.

54. Finally, the San Diego Residency Restrictions are an arbitrary, politically motivated act imposed by a local government in response to popular sentiments, based upon misinformation, which seeks retribution against Plaintiffs and other Registrants who constitute a socially outcast minority. The San Diego Residency Restrictions also lend themselves to discriminatory enforcement as well as the suppression of the constitutional rights of Plaintiffs and other Registrants and the individuals who reside with them, including spouses and children.

55. For the reasons stated above, the San Diego Residency Restrictions are preempted by California state law, and are also in violation of the Fourteenth Amendment to the United States Constitution.

## FIRST CLAIM

### (State Law Preemption)

56. Plaintiffs re-allege paragraphs 1 through 55 of this Complaint as though fully set forth herein.

57. Article XI, Section 7 of the California Constitution provides that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Accordingly, local ordinances in conflict with, or preempted by, state law are invalid and unenforceable.

58. California state law contains a comprehensive scheme regulating the daily lives of Registrants, including the areas in which they may be present. By enacting this comprehensive scheme, the Legislature evinced an intention to fully occupy the field of sex offender regulation. *People v. Nguyen*, 222 Cal. App. 4th 1168 (2014), *rev. denied* 2014 Cal. LEXIS 3030 (2014).

59. California Penal Code section 3003.5(c), also known as "Jessica's Law," does not authorize local government to impose residency restrictions on individuals other than parolees. Accordingly, those provisions of the San Diego Residency Restrictions

which apply to Plaintiffs and other Registrants who are not currently on parole are preempted and unconstitutional.

## SECOND CLAIM

### (42 U.S.C. § 1983 – Fourteenth Amendment – Due Process and Equal Protection)

60.     Plaintiffs re-allege paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61.     By leaving in place, enforcing, and/or threatening to enforce the San Diego Residency Restrictions, Defendants deprive Plaintiffs and other Registrants of rights guaranteed by the Fourteenth Amendment of the United States Constitution, including Substantive Due Process and Equal Protection, as well as the rights to family autonomy, privileges and immunities, and the right to travel.  Defendants commit these unconstitutional acts under color of authority of law.

62.     The San Diego Residency Restrictions constitute arbitrary and capricious state action that bears no rational relationship to a legitimate state interest, and as such violates the Due Process Clause of the Fourteenth Amendment.

63.     The San Diego Residency Restrictions also violate the Fourteenth Amendment's guarantee of Equal Protection by making an arbitrary and irrational distinction between Registrants convicted of offenses before and after the effective date of the Ordinance, and by imposing the San Diego Residency Restrictions on the latter group but not the former.

64.     Continued enforcement or threats of enforcement of the San Diego Residency Restrictions violates the rights of Plaintiffs and other Registrants which are protected by the Fourteenth Amendment of the United States Constitution.  Therefore, the San Diego Residency Restrictions are void, both facially and as applied, and should be enjoined and their previous enforcement nullified.  The injuries Plaintiffs and other Registrants have suffered and continue to suffer are the result of actions taken by Defendants and are severe, irreparable, and ongoing.  Immediate and permanent

injunctive relief is necessary to halt and prevent further occurrence of these ongoing constitutional deprivations and infliction of irreparable harm.

## THIRD CLAIM

### (42 U.S.C. § 1983 – Fourteenth Amendment – Void for Vagueness)

65. Plaintiffs re-allege paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66. The San Diego Residency Restrictions are unconstitutionally vague in that they fail to permit persons of ordinary intelligence from knowing what the Ordinance requires, and likewise encourage arbitrary and discriminatory enforcement of the Ordinance.

67. Continued enforcement or threats of enforcement of the San Diego Residency Restrictions violates the rights of Plaintiffs and other Registrants which are protected by the Fourteenth Amendment of the United States Constitution. Therefore, the San Diego Residency Restrictions are void, both facially and as applied, and should be enjoined and their previous enforcement nullified. The injuries Plaintiffs and other Registrants have suffered and continue to suffer are the result of actions taken by Defendants and are severe, irreparable, and ongoing. Immediate and permanent injunctive relief is necessary to halt and prevent further occurrence of these ongoing constitutional deprivations and infliction of irreparable harm.

## FOURTH CLAIM

### (28 U.S.C. §2201 – Declaratory Relief)

68. Plaintiffs re-allege paragraphs 1 through 67 of this Complaint as though fully set forth herein.

69. An actual controversy exists between Plaintiffs and Defendants regarding the constitutionality and enforceability of the San Diego Residency Restrictions.

70. Plaintiffs are entitled to a declaration of rights with regard to the San Diego Residency Restrictions.

## **PRAYER FOR RELIEF**

Because of the actions alleged above, Plaintiffs seek judgment against Defendants as follows:

a.      That Defendants be enjoined in perpetuity from enforcing Chapter 5, Article 8, Division 6 of the San Diego Municipal Code;

b.      That Chapter 5, Article 8, Division 6 of the San Diego Municipal Code be declared null and void under the Fourteenth Amendment to the United States Constitution; and Article I, Section 7 of the California Constitution;

c.      That Plaintiffs recover from the Defendants, under 42 U.S.C. Section 1988, all of Plaintiffs' reasonable attorney's fees, costs and expenses of this litigation; and

d.      That Plaintiffs recover such relief as the Court deems just and proper.


Dated:  August 7, 2017                    LAW OFFICE OF JANICE M. BELLUCCI


By:  _____*/s/ Janice M. Bellucci*_____
Janice M. Bellucci
Attorney for Plaintiffs